UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 12-CIV-60704–SEITZ/SIMONTON

APOTEX, INC., a Canadian corporation and
APOTEX CORP., a Delaware corporation,

        Plaintiffs,

vs.

MYLAN PHARMACEUTICALS, INC., a
West Virginia corporation,

        Defendant.

Case No.:  12-CIV-60704-PAS

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

Plaintiffs Apotex Inc. and Apotex Corp. (collectively "Apotex") sue Defendant Mylan Pharmaceuticals Inc. ("MPI") and state:

## NATURE OF THE ACTION

1.     This is an action for patent infringement of certain process claims arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 and 281-285.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1338(a).

## PARTIES

2.     Plaintiff Apotex Inc. is a Canadian corporation having its principal place of business in Toronto, Ontario, Canada.

3.     Apotex Inc. is a pharmaceutical company that specializes in offering life-saving, generic medications to consumers at a lower cost than branded medications.

4.     Plaintiff Apotex Corp. is a Delaware corporation having its principal place of business in Broward County, Florida.

5.      Apotex Corp. is the exclusively licensed distributor of Apotex Inc.'s generic quinapril medication in the United States.

6.      Defendant MPI is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.  MPI has designated a registered agent for the service of process in Florida, namely Corporation Service Company located in Tallahassee.

7.      MPI is a wholly-owned subsidiary of Mylan Inc.  Mylan Inc. is the parent company of MPI.

8.      On information and belief, MPI develops, manufactures, tests, packages, markets, promotes, offers to sell, sells and distributes pharmaceutical products containing quinapril in the United States, including this judicial district.

## JURISDICTION AND VENUE

9.      Venue is proper in this district under 28 U.S.C. § 1400(b) and/or 28 U.S.C. § 1391(b) and (c) 100 *et seq*. because MPI committed acts of patent infringement in this judicial district, a substantial part of the events giving rise to this claim occurred in this judicial district, and MPI is subject to personal jurisdiction in this judicial district.

10.      This Court has personal jurisdiction over MPI by virtue of its offers for sale, sales and distribution of products, including the products manufactured by the process that are the subject of this Amended Complaint, throughout the State of Florida and in this District.  MPI has also placed, and is continuing to place, products into the stream of commerce in this District, and it is reasonable to expect that such products will continue to enter and be used by consumers in Florida, including in this judicial district.

## GENERAL ALLEGATIONS

### Apotex's '486 Patent

11.     U.S. Patent No. 6,531,486 ("the '486 Patent"), entitled "Pharmaceutical Compositions Comprising Quinapril Magnesium," was duly and lawfully issued by the U.S. Patent and Trademark Office on March 11, 2003.  A true and correct copy of the '486 Patent is attached hereto as **Exhibit 1**.

12.     Apotex Inc. is the lawful owner by assignment of all right, title and interest in the '486 Patent.

13.     Apotex Corp. is the exclusive licensee of the '486 patent.

14.     The sole inventor listed on the '486 patent is Bernard C. Sherman.

15.     The '486 patent relates to, *inter alia*, processes for making solid pharmaceutical compositions (e.g. tablets) comprising quinapril magnesium made by reacting quinapril or an acid addition salt thereof (e.g. quinapril hydrochloride) with an alkaline magnesium compound (e.g. magnesium carbonate or magnesium hydroxide) in the presence of a solvent (e.g. water) so as to convert the quinapril or quinapril salt to quinapril magnesium.  Represented another way, the '486 patent claims certain methods of making tablets comprising quinapril magnesium, which include, but are not limited to, methods that result in the following chemical reaction:

$$2 \ QH \cdot HCl + 2 \ MgCO_3 \rightarrow MgQ_2 + MgCl_2 + 2 \ CO_2 + 2 \ H_2O$$

wherein $QH \cdot HCl$ is quinapril hydrochloride, $MgCO_3$ is magnesium carbonate, $MgQ_2$ is quinapril magnesium, $MgCl_2$ is magnesium chloride, $CO_2$ is carbon dioxide (a gas), and $H_2O$ is water.  See **Exhibit 1** at col. 3:15-22.

16.      Claims 1-12 and 16-19 claim such processes.  In this action, Apotex is not asserting

Claims 13-15 of the '486 patent.  Independent Claim 1 of the '486 patent claims:

> A process of making a solid pharmaceutical composition comprising quinapril magnesium, said process comprising the step of reacting quinapril or an acid addition salt thereof with an alkaline magnesium compound in the presence of solvent so as to convert the quinapril or quinapril acid addition salt to quinapril magnesium.

17.      Claim 8 of the '486 patent, depends on Claim 1 and claims methods of making such

compositions by certain types of wet granulation techniques:

> The process of Claim 1 comprising the steps of:
> i) mixing the quinapril or acid addition salt thereof and alkaline magnesium compound with 1 or more other excipients;
> ii) adding a solvent and mixing to obtain a wet mass;
> iii) drying the wet mass to obtain a dry mass; and
> iv) further processing the dried mass into the solid pharmaceutical reacting quinapril or an acid addition salt thereof with an alkaline magnesium compound in the presence of solvent so as to convert the quinapril or quinapril acid addition salt to quinapril magnesium.

18.      Claims 16-19 of the '486 patent, depend on, *inter alia*, Claim 8, and encompass

within their scope wet granulation methods wherein specified percentages of the quinapril or

quinapril salt starting material is converted to quinapril magnesium.  For example, Claim 16

claims:

> The process of Claim 1, 2, 3, 4, 5, 6, 7 or 8 wherein the percentage of the quinapril and/or a salt thereof or acid addition salt converted to quinapril magnesium is at least about 80%.

19.   Quinapril has the following chemical structure:



20.   Quinapril hydrochloride is an acid addition salt of quinapril that has the following structure:

21.    Quinapril magnesium is a metal complex of two quinapril molecules and one magnesium ion that has the following structure:



**Apotex's ANDA Products**

22.    Apotex Inc. has manufactured generic Quinapril tablets for Apotex Corp by a process described and claimed in the '486 Patent as described in Abbreviated New Drug Application ("ANDA") No. 076-240.

23.    The U.S. Food and Drug Administration ("FDA")  approved ANDA No. 076-240 on January 26, 2006 allowing Apotex to market quinapril tablets for the treatment of hypertension when administered alone or in combination with thiazide diuretics.  ANDA No. 076-240 was approved for four such Products that have varying doses of the active ingredient quinapril and contain an amount of quinapril salt equivalent to (a) 5 mg quinapril; (b) 10 mg quinapril; (c) 20 mg quinapril; and (d) 40 mg quinapril.  Apotex's ANDA products are manufactured by a process where quinapril hydrochloride and magnesium hydroxide starting materials are mixed and wet

6

granulated in a water-based solvent under conditions that allows for the quinapril hydrochloride to convert to quinapril magnesium.

24.     As part of its development of its ANDA product, Dr. Sherman and Apotex conducted experiments to generate a stable quinapril tablet.  From these experiments, it was determined that mixtures of quinapril hydrochloride and magnesium salts (e.g. carbonate or hydroxide) were not sufficiently stable to be marketed as a pharmaceutical product.

**MPI's Quinapril Combination Products**

25.     Mylan received FDA approval for ANDA No. 077-093 to market generic quinapril hydrochloride and hydrochlorothiazide ("HCTZ") products ("Mylan's Quinapril Combination Products") in the United States on March 28, 2005.  ANDA No. 077-093 was approved for three such Products that have varying doses of the two active ingredients, quinapril and HCTZ.  The three Mylan Quinapril Combination Products contain (a) 12.5 mg HCTZ and an amount of quinapril salt equivalent to 10 mg quinapril; (b) 12.5 mg HCTZ and the equivalent of 20 mg quinapril; and (c) 25 mg HCTZ and the equivalent of 20 mg quinapril.  Thus, all of Mylan's Quinapril Combination Products include at least 10 mg of quinapril.

26.     According to MPI's product insert, its Quinapril Combination Products contain quinapril hydrochloride, magnesium carbonate, and magnesium stearate.  A true and correct copy of MPI's product insert for its Quinapril Combination Products is attached hereto as **Exhibit 2**.

27.     On information and belief, all three of Mylan's Quinapril Combination Products are made using the same or similar processes because they were included in the same ANDA.

28.     According to data available from IMS Health, Mylan has sold nearly 51.5 million units of its Quinapril Combination Products, which resulted in over $32.2M in sales, from 2007

to 2011.  MPI currently continues to sell its Quinapril Combination Products under ANDA 077-093 in the United States.

### MPI's Proprietary Manufacturing Process

29.     MPI's exact manufacturing process for its Quinapril and Quinapril Combination Products is a proprietary method that has not been disclosed publicly.

30.     Apotex has requested Mylan to produce information about its process so that Apotex could definitively determine infringement.   Mylan, however, has refused to produce such information.   Based on the '486 patent teachings, publicly available information, logical deductions, and testing on Mylan's Quinapril Combination Products, Apotex has been able to determine that it is more likely than not that Mylan uses Apotex's claimed process when making its Quinapril Combination Products.

31.     The asserted claims of the '486 patent are for certain processes for converting quinapril into quinapril magnesium.  One of the reactions that is taught for this conversion is the following chemical reaction:

$$2 \text{ QH·HCl} + 2 \text{ MgCO}_3 \rightarrow \text{MgQ}_2 + \text{MgCl}_2 + 2 \text{ CO}_2 + 2 \text{ H}_2\text{O}$$

wherein QH·HCl is quinapril hydrochloride, $MgCO_3$ is magnesium carbonate, $MgQ_2$ is quinapril magnesium, $MgCl_2$ is magnesium chloride, $CO_2$ is carbon dioxide (a gas), and $H_2O$ is water. *See* **Exhibit 1** at col. 3:15-22.

32.     As detailed *supra*, Mylan's Quinapril Combination Products are sold with a label and insert that lists quinapril hydrochloride and magnesium carbonate as ingredients.  In other words, Mylan uses these two chemical ingredients in making their tablets.  These are the exact two reactants that Apotex describes as one of the reactions of the inventive process in the '486 patent.

Therefore, this evidence supports the conclusion that Mylan's Quinapril Combination Products are made by a process claimed in the '486 patent.

33.     Mylan's Quinapril Combination Products have the starting materials (i.e. the reactants quinapril hydrochloride and magnesium carbonate) that Dr. Sherman describes in the '486 patent.  The next step for Apotex, therefore, was to determine whether Mylan's Quinapril Combination Products contain the same end product as described in the '486 patent – quinapril magnesium.

### Testing on Mylan's Quinapril Combination Product

34.     Testing of Mylan's Quinapril Combination Product demonstrates that it contains quinapril magnesium, not quinapril hydrochloride as listed on MPI's product insert.  The presence of quinapril magnesium in Mylan's Product, coupled with the listing of quinapril hydrochloride, magnesium carbonate, and magnesium stearate as ingredients on its Quinapril Products' insert, provides an indication that Mylan's Quinapril Combination Product is made by a process covered by one or more of the claims 1-12 and 16-19 of the '486 patent.

35.     In late 2011 and early 2012, Apotex obtained and conducted testing on tablets of MPI's 10 mg/12.5 mg Quinapril/HCTZ Combination Product (lot # 3030668).

36.     In this set of studies, Mylan's Combination Product was analyzed by spectroscopic methods and compared to an Apotex Quinapril Product (5 mg tablets, lot # JD7357) to study whether the magnesium compounds present as inactive ingredients in these drug products had an effect on the chemical structure of quinapril.  As stated above, Apotex's Quinapril Product employs the process claimed in the '486 patent.  Therefore, similarities found through analysis would suggest that Mylan used and uses a process claimed in the '486 patent to convert the

reactants to achieve the same end product – quinapril magnesium – in its Quinapril Combination Products.

37.     Three different techniques were used to analyze the quinapril: (a) proton ($^1$H) nuclear magnetic resonance (NMR); (b) carbon ($^{13}$C) NMR; and (c) liquid chromotagraphy-mass spectroscopy (LC-MS).  In addition to the tablets, quinapril hydrochloride (USP standard, lot # G0H422) and HCTZ (USP standard, lot # J0F070) drug substances were also analyzed by $^1$H and $^{13}$C NMR.

38.     Other analytical tests and techniques can be used to determine whether the quinapril in the tablets is quinapril magnesium, including, but not limited to, infrared (IR) spectroscopy, Raman spectroscopy, time of flight-secondary ion mass spectroscopy (TOF-SIMS), ion chromatography (IC), and gas emission tests.  Many of these techniques have been used to determine the chemical composition of drug products for at least twenty years.

*Background on NMR and MS Analytical Testing*

39.     NMR spectroscopy is a common technique that can be used to obtain chemical and structural information about a sample.  NMR uses high power magnetic fields to study the nuclei of the atoms in samples.  The nuclei of certain atoms will behave like tiny ball magnets when placed in a strong magnetic field.  By far, the most widely used nuclei in NMR spectrometry are hydrogen ($^1$H) and carbon ($^{13}$C).  The instrument is essentially a radio transmitter and radio receiver.  A plot of the frequencies of the absorption of a radio wave of a certain frequency versus peak intensity constitutes an NMR spectrum.

40.     There are several parameters that can be measured by NMR to gather information about the chemical sample.  One parameter is the number of peaks in a spectrum of a sample. Another parameter is the frequency of the peaks or signals in a spectrum, which is also called the

chemical shift and is plotted in parts per million (ppm) versus intensity.  The spectrum can be studied to determine whether the peaks correspond to accepted peak ranges for different types of hydrogen and carbon atoms in the molecules.  In other words, different types of hydrogens and carbons can have different chemical shifts depending on what other atoms are attached to them.

41.    Also, comparisons between the chemical shifts for an unknown sample with a known sample (also called a "reference sample") can be used determine the structural information about the unknown compound.  For example, the absence of peaks corresponding to the reference sample in an unknown sample can be used to determine that the unknown sample differs from the reference sample.

42.    NMR has been used to monitor the progress of a reaction because a change in chemical shifts of certain atoms is often indicative of a change in chemical structure.  For example, a carboxylic acid group (-COOH) is likely to have a different chemical shift than a carboxylate ($-COO^-$) that is present in a salt formed by reaction of a carboxylic acid and an alkaline metal salt.

43.    Mass spectrometry is an analytical technique that allows the user to analyze samples based on the molecular weight of the chemical species therein.  Based on the atomic mass of the chemical molecules, one can determine what chemicals are present in a sample.

44.    A mass spectrometer has three main components: the ionizer, the mass analyzer, and the ion detector.  The sample (in either liquid or gas form) is collected and then introduced into the system and ionized, by one of a number of known methods usually involving an electric field.  With most ionization methods, there is the possibility of creating either positively or negatively charged sample ions.  Positive ion electrospray ionization (ESI) was used in Apotex's testing.  The ionized molecules are pulled into a mass analyzer, which consists of metal or metal-

coated rods that act as electrodes. A frequency voltage is then applied to the electrodes, which forces the ions to oscillate back and forth.  The typical ion detector consists of a series of slits that direct only one set of ions at a time into the collector where they are detected and amplified by an electron multiplier.

45.     The primary data obtained from a mass spectrometer is called a mass spectrum. The output is often graphically plotted as mass-to-charge ratio (m/z) on the horizontal axis and relative intensity or normalized (percent) abundance on the vertical axis. The most intense peak in the spectrum is called the base peak and is assigned a value of 100%.  The intensities of the other peaks are reported as percentages of the base peak.  The m/z and intensity data can also be presented as a table.

46.     The simplest type of ionization that occurs in a MS analysis is the removal of a single electron from the molecule to form what is called the "molecular ion" or "$M^+$."  When MS experiments are done under positive ion mode (as they were here), a commonly detected peak is the protonated molecular ion or "$M+H^+$."

47.     The ESI ionization technique used in Apotex's testing is known as a "soft" ionization method as the sample is ionized by the addition of a proton, with very little extra energy remaining to cause fragmentation of the sample ions.  As such, the protonated molecular ions remain intact long enough to reach the detector and the protonated molecular ion peak is often observed in the mass spectrum.

48.     The molecular ion and protonated molecular ion of many compounds are called "singly charged ions" because they have only one positive charge associated with the ion. However, in certain cases, ions can be detected that have two or more charges.  Doubly charged

ions are fairly common.  A molecular ion with a single positive charge corresponds to mass m, but the same ion with two positive charges corresponds to m/2.

49.    In addition to the molecular ion, complex ions that have masses larger than the molecular ion of the chemical compound can be detected in certain cases, especially when metal ions are involved. ESI-MS is one of the most effective techniques for the detection of weak molecular interactions such as those in metal complexes (e.g. quinapril magnesium).

50.    The presence of chemical compounds in a sample of a unknown material can be tested by comparing the peaks present in the mass spectra with peaks from a known or reference sample.  One can test for the presence of a certain chemical species in a sample by comparing the unknown chemical species with a known sample under the same conditions in the same system, to see if the fragmentation patterns match.

### Nuclear Magnetic Resonance (NMR) Spectrometry of Apotex's and Mylan's Products

51.    For the NMR experiments, forty (Apotex) or fifty (Mylan) tablets were crushed. Acetonitrile (120 mL) was added to the tablets and the mixture was sonicated.  After twenty-five minutes, a drying agent (sodium sulfate) was added to the flask.  The mixture was filtered and washed with acetonitrile.  The filtered solution was evaporated under reduced pressure to give a powder or solid.  The samples were freeze-dried to remove residual solvents.  NMR spectra were obtained with a Bruker AV 400 spectrometer using DMSO-$d_6$ as the solvent.   Sample concentrations for samples from Apotex and Mylan's Products were approximately 80 mg/mL. Sample concentrations for the quinapril hydrochloride and HCTZ drug substances were approximately 80 mg/mL and 50 mg/mL, respectively.  $^1$H NMR spectra were acquired at 400.1 MHz and $^{13}$C NMR spectra were recorded at 100.6 MHz.  Chemical shifts are reported in ppm relative to a tetramethylsilane (TMS) internal standard.

52.     The NMR data demonstrated that the quinapril species from the Apotex and Mylan tablets is not quinapril hydrochloride because peaks in the [1]H and [13]C NMR spectra of quinapril hydrochloride drug substance are not present in the spectra for Apotex and Mylan's Products.

53.     For example, quinapril hydrochloride has two peaks around 1.55 ppm in this portion of its [1]H NMR spectrum.  However, these peaks are absent from the spectra of both Apotex and Mylan's Products, which have similar sets of chemical shifts with similar relative intensities.

54.     Similarly, quinapril hydrochloride has a peak around 171.5 ppm in its [13]C NMR spectrum.  This is likely the carbon atom of the carboxylic acid in quinapril as carboxylic aciids are often found in the range of 150-185 ppm.  However, the spectra for Apotex and Mylan's Products show a peak around 174.0 ppm and no peaks at 171.5 ppm.  This increase in chemical shift often occurs when a carboxylic acid is replaced with a carboxylate anion.

55.     The differences in chemical shift in the [1]H and [13]C NMR spectra can be caused by formation of quinapril magnesium during the manufacturing processes used to make Apotex's and Mylan's Products.  This observation is consistent with the MS study discussed below.

56.     The NMR data further demonstrated that the quinapril species from the Apotex and Mylan tablets are similar (if the peaks from the additional active ingredient, HCTZ, in Mylan's Product are disregarded).  This suggests that the quinapril ingredient in each case is similarly converted from quinapril hydrochloride to quinapril magnesium.

### *Mass Spectrometry of Apotex's and Mylan's Products*

57.     For the MS experiments, three (Apotex) or five (Mylan) tablets were weighed and ground into a powder.  The portion of the powder corresponding to five milligrams (5.0 mg) of quinapril was added to five milliliters (5.0 mL) of acetonitrile, mixed, and sonicated, then filtered.  A sample of the filtered solution was taken and diluted with acetonitrile to provide the

sample solution for analysis.  MS analysis was carried out on an AB Sciex Q-Trap LC-MS/MS system in positive ion mode using electrospray ionization using flow injection at a flow rate of 5 µL/min.  Sample concentrations were approximately 0.25 mg/mL.

58.     The MS data demonstrated that the quinapril species from the Apotex and Mylan tablets contains quinapril magnesium.  Further, the MS data for the Apotex and Mylan tablets are similar.  In particular, four peaks predominate the mass spectra, namely the ions with mass-to-charge (m/z) ratios of 439, 461, 911, and 1361.  The ion with a m/z of 439 represents the protonated molecular ion of quinapril.  The other three major ions have m/z ratios consistent with the structures of quinapril-magnesium complexes:  $[(Q-Mg-Q)+Mg]^{+2}$ with m/z = 461, $[(Q-Mg-Q)_2+Mg]^{+2}$ with m/z = 911, and $[(Q-Mg-Q)_3+Mg]^{+2}$ with m/z = 1361, where Q is quinapril carboxylate.  The magnesium in these ions originates from magnesium compounds (e.g. magnesium carbonate) present as inactive ingredients in each drug product.

*Conclusions from NMR and MS Analysis of Mylan's Quinapril Combination Product*

59.     Apotex's testing indicates that MPI's proprietary manufacturing process causes the ingredients listed on its Product Insert (e.g., quinapril hydrochloride and magnesium carbonate or stearate) to react to form quinapril magnesium.

60.     Upon information and belief, MPI's process for manufacturing its Quinapril Combination Products involves a solvent because of the ingredients listed on Mylan's Product Insert, Apotex's testing that shows the tablets contain quinapril magnesium, and the low propensity for quinapril hydrochloride and magnesium carbonate or stearate to react in the absence of solvent.

61.     As such, the presence of quinapril magnesium in Mylan's Quinapril Combination Product leads to a reasonable belief that the Quinapril Combination Products are made using a

process comprising the step of reacting quinapril hydrochloride with magnesium carbonate and/or magnesium stearate (i.e. alkaline magnesium compounds) in the presence of a solvent so as to convert the quinapril hydrochloride to quinapril magnesium. This process would fall within the scope of the process of at least Claim 1 of the '486 patent.

62.     Furthermore, all of Apotex's testing on Mylan's Quinapril Combination Product to date, when taken as a whole, leads to a reasonable belief that nearly all, if not all, of the quinapril in the tablets is in the form of quinapril magnesium. As such, the process would fall within the scope of the processes in one or more of Claims 16-19.

63.     While Apotex's testing demonstrates that Mylan's Quinapril Combination Products contain quinapril magnesium, Apotex is presently not aware of any analytical technique which can definitively establish that Mylan's Quinapril Products were made by one or more of the processes claimed in the '486 patent. For example, Apotex cannot definitively establish from the available information whether MPI uses a solvent in its manufacturing process, what the solvent is if one is used, or whether wet granulation was used to make its Products. Also, MPI's proprietary manufacturing process cannot be fully ascertained from mere examination of the publicly available information about Mylan's Quinapril Products, such as the Product Insert.

64.     Starting on June 11, 2012, Apotex, through its counsel, has repeatedly requested that MPI provide documents that accurately and completely describe its quinapril manufacturing process. After nearly a month of ignoring Apotex's requests, MPI's counsel responded by refusing to provide any documents and stating that "Mylan's position on the matter is set forth in its motion to dismiss."

65.     After an opportunity for discovery, there is likely to be evidence that confirms that MPI's process for manufacturing its Quinapril Combination Products comprises reacting

quinapril or an acid addition salt thereof (e.g. quinapril hydrochloride) with an alkaline magnesium compound (e.g. magnesium carbonate or magnesium stearate) in the presence of a solvent (e.g. water or an aqueous solution) so as to convert the quinapril or salt to quinapril magnesium, which process is covered by one or more of Claims 1-12 and 16-19 of the '486 patent.

66.     Apotex resorts to the judicial process and the aid of discovery to determine under appropriate judicial safeguards the exact process used by MPI to manufacture its Quinapril Product and confirm its belief that MPI infringes one or more claims of the '486 Patent.

## **Mylan's Quinapril Products**

67.     The FDA website lists "Mylan" as the owner of two approved ANDAs for marketing generic quinapril hydrochloride products ("Mylan's Quinapril Products") in the United States. Mylan's ANDAs for Quinapril Products are ANDA Nos. 076-694 and 076-036.

68.     Mylan received FDA approval for ANDA No. 076-694 to market its Quinapril Products in the United States on December 23, 2004.  ANDA No. 076-694 was approved for four such Products that have varying doses of the active ingredient and contain an amount of quinapril salt equivalent to (a) 5 mg quinapril; (b) 10 mg quinapril; (c) 20 mg quinapril; and (d) 40 mg quinapril.  As such, all of Mylan's Quinapril Products contain at least 5 mg of quinapril.

69.     Mylan also has approval from the FDA to market quinapril products in the United States pursuant to ANDA No. 076-036.  The FDA approved ANDA No. 076-036 on January 28, 2005.  ANDA No. 076-036 was approved for four Products that have varying doses of the active ingredient and contain an amount of quinapril salt equivalent to (a) 5 mg quinapril; (b) 10 mg quinapril; (c) 20 mg quinapril; and (d) 40 mg quinapril.  As such, all of these Quinapril Products contain at least 5 mg of quinapril.

70.     Counsel for MPI has represented that ANDA No. 076-036 was acquired by Mylan through its acquisition of Genpharm L.P. ("Genpharm").   On information and belief, Mylan Laboratories Inc. entered into a share purchase agreement with Merck KGaA ("Merck") on May 12, 2007, through which Mylan Laboratories Inc. acquired, *inter alia*, Genpharm.   On information and belief, at the time of the acquisition, Genpharm was part of the Merck Generics Holding GmbH ("Merck Generics").   On information and belief, by October 2007, Mylan Laboratories Inc. controlled Genpharm as a wholly-owned subsidiary.   On or around October 29, 2007, Mylan Laboratories Inc. changed its name to Mylan Inc., the current parent company of Defendant Mylan Pharmaceuticals, Inc.

71.     Counsel for Mylan has represented that Mylan Pharmaceuticals Inc. has never marketed or sold a quinapril product under ANDA No. 076-036 and that Mylan Pharmaceuticals Inc. does not have samples of Products made pursuant to this ANDA.   However, on information and belief, Mylan Inc. has assumed Genpharm's liability as a result of the acquisition of the former Merck Generics business.

72.     According to Mylan's product insert, its Quinapril Products contain quinapril hydrochloride, magnesium carbonate, and magnesium stearate.   A true and correct copy of Mylan's product insert for its Quinapril Products is attached hereto as **Exhibit 3**.

73.     According to data available from IMS Health, Mylan had sold 889,470 units of its Quinapril Product, which resulted in $117,072 in sales, from 2007 to 2011.

74.     Upon information and belief, Mylan's Quinapril Products (under either ANDA No. 07-6694 or 07-6036) have been discontinued and not commercially available to the public since at least July 2011.   As such, Apotex has not been able to obtain a sample of any of Mylan's Quinapril Products.

## INFRINGEMENT OF THE PROCESS CLAIMS OF U.S. PATENT NO. 6,531,486
### (Quinapril Combination Products)

75.     The allegations of paragraphs 1-74 are realleged and incorporated herein by reference.

76.     This is an action for patent infringement of certain process claims arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 and 281-285.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1338(a).

77.     On March 11, 2003, United States Letters Patent No. 6,531,486 was issued to Bernard Sherman for inventions in methods of making pharmaceutical compositions comprising quinapril magnesium.  Apotex Inc., through an assignment from Bernard Sherman made nunc pro tunc as of March 11, 2003, has owned the patent throughout the period of Mylan's infringing acts and still owns the patent.

78.     Upon information and belief, which is likely to be substantiated through discovery, Mylan has infringed and is still infringing one or more of claims 1-12 and/or 16-19 of the '486 Patent by using a process covered by those claims to manufacture pharmaceutical products, including Mylan's Quinapril Combination Products, and/or by importing, selling and/or offering for sale the product of such process into the United States in violation of 35 U.S.C. §271 (a) and/or (g).  On information and belief, Mylan will continue to do so unless enjoined by this Court.

79.     Plaintiffs have provided Mylan with written notice of the infringement by filing the Complaint on April 20, 2012.  Apotex was not and is not required to provide statutory notice by marking its products with the '486 patent because it is only asserting method claims.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Mylan and grant the following relief:

a.  A judgment and decree that the '486 Patent is valid and enforceable;

b.  A judgment and decree that Mylan has infringed one or more of the method claims of the '486 Patent in violation of 35 U.S.C. § 271;

c.  A permanent injunction, pursuant to 35 U.S.C. § 283, enjoining Mylan and its officers, agents, employees and all others in concert or participation with them from acts of infringement of the '486 Patent;

d.  An Order, pursuant to 35 U.S.C. § 284, awarding Plaintiffs damages adequate to compensate for Mylan's infringement of the '486 Patent, in an amount to be determined at trial, but in no event less than a reasonable royalty; and

e.  Such other and further relief that the Court may deem just and proper.

**JURY DEMAND**

Apotex demands a trial by jury.

Dated: September 20, 2012                   Respectfully submitted,

                                        /s/ Matthew S. Nelles            
MATTHEW S. NELLES
Fla. Bar No. 009245
mnelles@broadandcassel.com
**BROAD AND CASSEL**
Attorneys for Plaintiffs
One Financial Plaza
100 S.E. Third Ave., Suite 2700
Fort Lauderdale, Florida  33394
Telephone: (954) 764-7060
Facsimile:  (954) 761-8135

**KATTEN MUCHIN ROSENMAN LLP**
Robert B. Breisblatt
Fla. Bar No. 145928
robert.breisblatt@kattenlaw.com
Eric C. Cohen (admitted pro hac vice)
Brian J. Sodikoff (admitted pro hac vice)
Martin S. Masar III (admitted pro hac vice)
Suresh B. Pillai (admitted pro hac vice)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone:  (312) 902-5480
eric.cohen@kattenlaw.com
brian.sodikoff@kattenlaw.com
martin.masar@kattenlaw.com
suresh.pillai@kattenlaw.com

Christopher B. Ferenc (admitted pro hac vice)
2900 K Street NW
North Tower - Suite 200
Washington, DC 20007-5118
Telephone:  (202) 625-3500
christopher.ferenc@kattenlaw.com

*Attorneys for Plaintiffs Apotex Corp. and Apotex Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 20th day of September 2012, I electronically filed the foregoing Amended Complaint with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the service list below via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Matthew S. Nelles
Matthew S. Nelles

## SERVICE LIST

Matthew S. Nelles
mnelles@broadandcassel.com
BROAD AND CASSEL
One Financial Plaza
100 S.E. 3rd Avenue, Suite 2700
Fort Lauderdale, Florida  33394
Telephone:  (954) 764–7060
Facsimile:  (954) 761–8135

Robert B. Breisblatt
robert.breisblatt@kattenlaw.com
Brian J. Sodikoff (*pro hac vice*)
brian.sodikoff@kattenlaw.com
Martin S. Masar III (*pro hac vice*)
martin.masar@kattenlaw.com
Suresh B. Pillai (*pro hac vice*)
suresh.pillai@kattenlaw.com
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, Illinois  60607
Telephone:  (312) 902-5200
Facsimile:  (312)-902-1061

*Attorneys for Plaintiffs Apotex, Inc.*
*and Apotex Corp.*

Eric D. Isicoff
Isicoff@irlaw.com
Susan Warner
Warner@irlaw.com
ISICOFF, RAGATZ & KOENIGSBERG
1200 Brickell Avenue, Suite 1900
Miami, Florida  33131
Telephone:  (305) 373-3232
Facsimile:   (305) 373-3233

Thomas J. Parker (*pro hac vice*)
thomas.parker@alston.com
Deepro R. Mukerjee (*pro hac vice*)
deepro.mukerjee@alston.com
Poopak Banky (*pro hac vice*)
paki.banky@alston.com
ALSTON & BIRD LLP
90 Park Avenue
New York, New York  10016-1387
Telephone:  (2120 210-9400
Facsimile:   (212) 210-9444

*Attorneys for Defendant*
*Mylan Pharmaceuticals, Inc.*

Maria J. Beguiristain
mbeguiristain@whitecase.com
WHITE & CASE LLP
Southeast Regional Financial Center
200 S. Biscayne Boulevard, Suite 4900
Miami, Florida  33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744

Aaron Stiefel (*pro hac vice*)
astiefel@kayscholer.com
Daniel P. DiNapoli (*pro hac vice*)
ddinapoli@kayscholer.com
Soumitra Deka (*pro hac vice*)
sdeka@kayscholer.com
Matthew Sklar (*pro hac vice*)
matthew.sklar@kayscholer.com
KAYE SCHOLER LLP
425 Park Avenue
New York, New York  10022
Telephone:  (212) 836-8000
Facsimile:  (212) 836-8689

*Attorneys for Defendants Pfizer Inc.
and Greenstone LLC*

Eric D. Isicoff
Isicoff@irlaw.com
Susan Warner
Warner@irlaw.com
ISICOFF, RAGATZ & KOENIGSBERG
1200 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone:  (305) 373-3232
Facsimile:  (305) 373-3233

Robert F. Green (*pro hac vice*)
rgreen@leydig.com
Christopher T. Griffith (*pro hac vice*)
cgriffith@leydig.com
Brett A. Hesterberg (*pro hac vice*)
bhesterberg@leydig.com
Peter H. Domer (*pro hac vice*)
pdomer@leydig.com
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza
180 N. Stetson Avenue, Suite 4900
Chicago, Illinois  60601-6731
Telephone:  (312) 616-5600
Facsimile:  (312) 616-5700

*Attorneys for Defendants Lupin Ltd. and
Lupin Pharmaceuticals, Inc.*