# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APOTEX, INC. and APOTEX CORP.,                :

:

          Plaintiffs,          :

:

      v.           :    CASE NO. 12-60704-CIV-
SEITZ/SIMONTON

:

MYLAN PHARMACEUTICALS INC.,         :

:

          Defendant.        :

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APOTEX, INC. and APOTEX CORP.,                :

:

          Plaintiffs,          :

:

      v.           :    CASE NO. 12-60705-CIV-
SEITZ/SIMONTON

:

PFIZER INC., and GREENSTONE LLC,      :

:

          Defendants.       :

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APOTEX, INC. and APOTEX CORP.,                :

:

          Plaintiffs,          :

:

      v.           :    CASE NO. 12-60708-CIV-
SEITZ/SIMONTON

:

LUPIN PHARMACEUTICALS, INC. and LUPIN LTD.,  :

:

          Defendants.       :

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EXPERT DECLARATION OF DR. MICHAEL ZAWOROTKO**

1

## I.  INTRODUCTION

At the request of Defendants Lupin Ltd. and Lupin Pharmaceuticals, Inc. and Mylan Pharmaceuticals, Inc. (collectively "Defendants"), I, Dr. Michael Zaworotko, declare and state that:

1.  I am submitting this declaration on behalf of Defendants and in support of their Opening Claim Construction Brief in the above-captioned action.

## II.  BACKGROUND

2.  I am a Professor in the Department of Chemistry at the University of South Florida in Tampa, the ninth largest university in the United States.  I have been in this position from September, 1999 until the present.  I served as Chair of the Department of Chemistry at the University of South Florida from September, 1999 until August, 2008.

3.  From January, 1998 to September, 1999, I served as Professor of Chemistry and Dean of the College of Arts and Sciences at the University of Winnipeg, Manitoba.  From August, 1985 to January, 1998, I served on the faculty of Saint Mary's University (Halifax, Nova Scotia), where I held various positions including Chair of the Department of Chemistry (8/93-8/97).

4.  I received my Bachelors of Science in Chemistry from Imperial College (London, U.K.) in June, 1977 and a Ph.D. in Chemistry from the University of Alabama in August, 1982. My Ph.D. research focused upon synthesis and structural chemistry of organic and coordination compounds.

5.  I served as a post-doctoral fellow at the University of Victoria, Canada, from April, 1982 until August, 1985. My postdoctoral research concerned synthesis and structural chemistry of coordination and organometallic compounds.

2

6.	I was awarded the President's Award for Research Excellence (Saint Mary's University, 1994), am an Honorary Member of the Academy of Science of Higher School of Ukraine, have been awarded Visiting Professorships to Université Louis Pasteur (Strasbourg, France, 1999) and the Institute of Biology and Chemistry of Proteins (Lyon, France, 2001), and I was Conference Universitaire de Suisse Occidentale Lecturer twice (2002 and 2005). In 2012, I was appointed Fellow of the American Association for the Advancement of Science.

7.	I served as Founding Editor of Crystal Engineering, published by Elsevier from 1997-2003.  I currently serve as Associate Editor of the journal Crystal Growth and Design, which is published by the American Chemical Society and is the highest impact factor journal in the field of crystallography.  I also serve on the editorial boards of Journal of Chemical Crystallography and Polyhedron.

8.	I co-organized the first international meeting devoted to the subject of crystal engineering (NATO-ASI meeting from 09/09/1996-09/20/1996).  I served as co-vice-chair of the 2nd Gordon Conference on Crystal Engineering that was held in June 2012 and I will serve as co-Chair of the 3rd Conference on Crystal Engineering to be held in 2014.

9.	I co-edited the proceedings of the NATO-ASI meeting (Seddon, K.R. and Zaworotko, M.J. "Crystal Engineering: the Design and Application of Functional Solids," Kluwer, 1999).  I co-edited a book titled "Organic Crystal Engineering: Frontiers in Crystal Engineering," that was published by Wiley in 2010.

10.	I have supervised the Ph.D. dissertations of approximately 14 students, and I have supervised the research of approximately 15 postdoctoral research associates.  I currently supervise a research group consisting of 10 Ph.D. students and one postdoctoral research associate.

3

11. I have published more than 300 papers in refereed journals, most of which deal with crystallization, X-ray crystallography, crystal engineering, crystal packing, polymorphism or related subjects. Evidence of the impact of these publications comes from the following: These papers have been cited approximately 21,000 times, including more than 9,400 citations since 2008; my h-index is 68; five of these publications have been cited more than 600 times; 48 of these publications have been cited more than 100 times; on February 10, 2011 I was listed by Thomson Reuters as the 20th highest citation impact chemist in the world for work published between 2000 and 2010.

12. I am listed as an inventor on six issued patents.

13. I have made more than 150 invited presentations at National and International Meetings in the area of crystal structures and crystal engineering, including several keynote or plenary lectures at international meetings. Approximately 60 of these presentations have addressed aspects of the crystal structures of pharmaceuticals with particular emphasis upon understanding crystal packing.

14. I have published more than 680 crystal structures representing a broad cross section of chemical types.

15. I have consulted for pharmaceutical companies in the United States and Europe and I have presented lectures on polymorphism and form of pharmaceuticals at industrial workshops and conferences. I served on the Scientific Advisory Board of a company that developed novel forms and formulations of pharmaceuticals and was bought by Johnson and Johnson (Transform Pharmaceuticals) from 2003-2005. Since 2006, I have served as Scientific Advisor to a company that develops novel forms and formulations of pharmaceuticals (Thar Pharmaceuticals). Since 2012, I have served as Scientific Advisor to a company that develops

4

new pharmaceuticals (Alkermes).  I also conduct a research program in crystal engineering sponsored by government agencies and companies.

16.     Additional details of my education and experience are set forth in my curriculum vitae, a copy of which is attached as Exhibit A.

## III.   FEES

17.     The compensation paid to me for my time spent working on this matter is based on an hourly rate of $400 per hour of preparation, meetings, research, and consultation, including deposition.

## IV.   PRIOR EXPERT TESTIMONY

18.     In the last four years, I have testified as an expert at trial or by deposition in the following matters: *Wyeth v. Sepracor, Inc.*, Patent Interference No. 105,685 (RES) (Bd. Pat. App. & Interf. 2010; *Roche Palo Alto LLC v. Endo Pharmaceuticals, Inc,* (Civil Action No. 10-cv-00261-GMS); *Cephalon Inc. and Cephalon France v. Mylan Pharmaceuticals Inc., Watson Laboratories, Inc., Sandoz Inc., Lupin Limited, Apotex Corp. and Apotex Inc.*, (Civil Action No. 1:10-md-2200-GMS); *Apotex Inc. v. Pfizer Canada, Inc.* Court File No. T-825-06.

## V.   MATERIALS CONSIDERED

19.     In addition to my general knowledge, education, and experience, including as evidenced by my publications listed in my curriculum vitae, I have reviewed numerous documents as part of this litigation.  I have identified some of them in this report, and others are identified at Exhibit B to this report.

## VI.   SUMMARY OF EXPECTED TESTIMONY

20.     I expect to testify at deposition, at the claim construction hearing, or at trial about matters that are discussed in this report, including the following: (1) the state of the art relating to synthesis and pharmaceutical formulation of ACE inhibitors; (2) the level of ordinary skill in the

5

art for the '486 patent; (3) the '486 patent, its specification, claims, and prosecution history; and (4) the indefiniteness of the term "quinapril magnesium" as used in the '486 patent.

21.     I may testify further as to subject matter within my area of expertise, which will be useful to inform the Court as to the bases of my opinions.

## VII.   SCOPE OF THIS DECLARATION/REPORT

22.     I have been asked by counsel for Lupin to review United States Patent No. 6,531,486 ("the '486 patent") and its related file history.  I have also been asked to consider the meaning of the claim term "quinapril magnesium" as recited in the claims of the '486 patent as it would be understood by a person of ordinary skill in the art.  In my opinion, the term "quinapril magnesium" as used in the '486 patent is not capable of being defined.

23.     I refer in my declaration and report to various documents and specifics.  However, I reserve the right to supplement my report to clarify possible ambiguities or to opine further upon future court rulings, agreements between the parties, or any further testimony given by any party, either by deposition, at any hearing, or at trial.  I further reserve the right to supplement my declaration and report upon additional information being provided by Plaintiffs or resulting from my interaction with others in the relevant areas.

## VIII.   LEVEL OF ORDINARY SKILL IN THE ART

24.     The hypothetical person of ordinary skill in the art would have an advanced degree in chemistry, pharmacy and/or pharmaceutics, or related fields, such as a masters degree or Ph.D., with a number of years of experience in that field.  Such a person could be a pharmacist or chemist having skills and experience in the development and formulation of pharmaceutical dosage forms, including experience in making solid dosage forms using wet granulation technology, or an analytical chemist having skills and experience in chemical analysis and characterization, or a synthetic chemist having skills and experience in chemical synthesis.  Such

a person, to supplement their own skills, would also have available access to other individuals with specialized skills that may include, an analytical chemist, synthetic chemist, pharmacist, pharmaceutical formulator, pharmacologist, toxicologist or clinician, to solve any given problem.  Accordingly, for example, a person of ordinary skill in the art could be a pharmaceutical formulator with access to the skills and knowledge of an analytical chemist or an analytical chemist with access to the skills and knowledge of a pharmaceutical formulator, or a synthetic chemist with access to the skills and knowledge of an analytical chemist, or an analytical chemist with access to the skills and knowledge of a synthetic chemist.

## IX.   INDEFINITENESS OF THE "QUINAPRIL MAGNESIUM" CLAIM TERM IN THE '486 PATENT

25.      In my opinion, a person of ordinary skill in the art would find the claim term "quinapril magnesium" to lack precision and to be incapable of definition when read in the light of the specification and the file history of the '486 patent.

26.      I understand that the parties in the present action have agreed that the claim term "magnesium quinapril" should be construed to mean "the magnesium salt of quinapril having the chemical formula $Mg(C_{25}H_{29}N_2O_5)_2$."

27.      In my opinion, for the reasons set forth below, the agreed construction still leaves the term "quinapril magnesium" as indefinite because there are many possible chemical structures that could fall within the scope of the proposed construction - "the magnesium salt of quinapril having the chemical formula $Mg(C_{25}H_{29}N_2O_5)_2$."  Moreover, the chemical formula for "quinapril magnesium" provided in the agreed construction does not clarify the scope of the term "quinapril magnesium" because a person of ordinary skill in the art would recognize that it is scientifically unsound.

7

28.    The term "Quinapril magnesium" appears to have been coined by the inventor and was not a term known in the art as of the time the application leading to the '486 patent was filed.  The specification provides no characterization of the structure of "quinapril magnesium" or the compositions resulting from various processes disclosed in the '486 patent as being useful to make "quinapril magnesium."  Analytical tools such as infrared spectroscopy, mass spectroscopy, x-ray powder diffraction, elemental analysis, differential scanning calorimetry, thermogravimetric analysis, chromatography information and/or melting point determination are often used to characterize pharmaceutical solids, but the '486 patent contains no such analysis. Similarly, the '486 patent provides no analytical method or test for determining whether a given solid pharmaceutical composition contains "quinapril magnesium" in any amount.  Moreover, the '486 patent does not even provide a hypothetical chemical structure for "quinapril magnesium."  As such, there is no scientific basis in the '486, patent upon which we can conclude that "quinapril magnesium," whatever it is, ever existed.

29.    Regarding the use of the term "quinapril magnesium," in the specification, it states that "the magnesium salt of quinapril (i.e. quinapril magnesium) is sufficiently stable to enable stable solid compositions…"  '486 patent, Col. 2, ll. 46-47.  In addition, the specification states that $Mg(C_{25}H_{29}N_2O_5)_2$ is the molecular formula for quinapril magnesium.  *Id.* at Col. 3, ll. 11-21.  From these references, one may conclude that the term "quinapril magnesium" is meant to refer to a salt that is comprised of one magnesium cation and two quinapril anions.  However, as mentioned above, the '486 patent does not provide any data or supporting evidence that "quinapril magnesium" has the chemical formula disclosed in the '486 patent or that there is a magnesium salt of quinapril.

30.     The Examples of the '486 patent describe a number of different processes for producing a solid pharmaceutical composition comprising "quinapril magnesium," each of which includes, in addition to the quinapril acid addition salt and an alkaline magnesium compound, a variety of pharmaceutical excipients and different types and amounts of solvent.  A POSA would have known that, depending on the solvents, excipients and reaction conditions used for each example, one may obtain a solid pharmaceutical composition containing a variety of quinapril, magnesium and solvent associations.  As noted above, there is no data in the patent to evidence that any of the pharmaceutical compositions resulting from the claimed processes contains "quinapril magnesium," whatever it is.

31.     I note that the file history for the '486 patent is silent with regards the identity of "quinapril magnesium."

32.     Quinapril is a complex molecule containing the following functional groups: three aromatic rings, an amino (NH) group, an ester group, an amide group, a carbonyl group and a carboxylic acid group.  Pharmaceutical compounds often contain such functional groups at their peripheries that participate in hydrogen bonding or form bonds with metals such as magnesium. For example, carbonyl, ester, ether, carboxylic acid, amine, amide, phenol, alcohol and groups that contain a basic nitrogen atom, are all functional groups that are commonly encountered in pharmaceutical compounds and can participate in hydrogen bonding or of forming bonds with cations such as magnesium.  Quinapril is therefore typical of pharmaceutical compounds.

33.     To determine the manner in which magnesium cations would be expected to form bonds with the types of functional group present in quinapril, I retrieved single crystal x-ray-diffraction (SCXRD) crystallographic information file ("cif") information for magnesium that was available from the Cambridge Structural Database ("CSD"), a repository of SCXRD

9

information on organic compounds that would have been readily available to a POSA at the time of filing of the '486 patent.  Alternatively, a POSA could have retrieved the information directly from the primary literature articles that originally published the structural information.  The information I retrieved reveals that prior to 1998 there were 76 SCXRD reports of magnesium carboxylate compounds in which magnesium carboxylate bonds were observed.  Fifty-five (55) of these compounds contain water molecules and all exhibit six or more bonds to magnesium (seventy (70) forming six bonds).  Prior to 1998, there were twelve (12) such SCXRD reports concerning ester groups, nine (9) such reports concerning amide groups and seven (7) such reports concerning urea groups.  Of these twenty-eight (28) structures, twenty-seven (27) of them exhibit magnesium cations with six bonds and one exhibits a magnesium cation with seven bonds.  Three structures are representative of this survey and are discussed in the following section.

34.      The structure of a magnesium cation bonded to two acetate anions and four water molecules is illustrated directly below at (1).  Irish *et al*., *Acta Crystallographica Sect.C: Cryst. Struct. Commun*., 47, 2322 (1991) ("Exhibit C").  The structure of a magnesium cation bonded to one orotate anion through two functional groups and four water molecules is illustrated below at (2).  Mutikainen *et al*., *Z. Kristallografiya*, 212, 65 (1997) ("Exhibit D"). The structure of a magnesium cation bonded to four urea molecules and two water molecules is presented in the figure below at (3).  Lebioda *et al*., *Acta Crystallographica, Sect. B*: *Struct. Crystallogr. Cryst. Chem*., 36, 693 (1980) ("Exhibit E").



**(1)**

**(2)**

**(3)**

11

35.     The following conclusions can be drawn from my evaluation of these cif files: given the manner in which "quinapril magnesium" was prepared in the '486 patent, a person of ordinary skill in the art would have a reasonable expectation that any quinapril and magnesium-containing product may contain bonded water or other solvent molecules.  Moreover, it is certain that any quinapril and magnesium-containing product will exhibit at least six bonds to magnesium.  A POSA would therefore recognize that the '486 patent is scientifically unsound in providing the chemical formula "$Mg(C_{25}H_{29}N_2O_5)_2$" for "quinapril magnesium."

36.     Even if the '486 patent is considered to provide a chemical formula "$Mg(C_{25}H_{29}N_2O_5)_2$" for "quinapril magnesium," (with no underlying data to support such a formula), such information would not have clarified the scope of the term for a POSA.  A POSA would have known that a myriad of chemical compounds or complexes, all having different structures and properties, could satisfy such a chemical formula.  The magnesium ion in the chemical formula $Mg(C_{25}H_{29}N_2O_5)_2$, could be bonded or associated with two quinapril moieties in a number of different modes and the location of the magnesium indeed may vary depending upon the conditions under which the "quinapril magnesium" was made.

12

37.     For instance, various sites (known to chemists as functional groups) on quinapril are capable of bonding to magnesium cations, as illustrated on the quinapril structure below:



38.     Thus, it is possible for a number of very different compounds to form depending on the manner in which the magnesium ion associates with the quinapril molecule, none of which are disclosed in the '486 patent.  It also follows that, the position in which magnesium associates or bonds with the quinapril moiety will in turn affect the properties of the resulting compound.

39.     The '486 patent disclosure and the proposed chemical formula clearly fail to take into account the fact that the magnesium cation will bind through six or more sites.  Further, when a quinapril-magnesium product is formed under the conditions exemplified in the '486 patent, such as an approximate 6:1 ratio of magnesium cation to quinapril anion, in the presence of water and/or organic solvent and other excipients, more complex structures would be expected to form than that suggested by the '486 patent.

40.     U.S. published patent application US 2005/0267159, published December 1, 2005 ("Exhibit F"), addresses magnesium complexes of s-omeprazole, another organic molecule with

multiple functional groups. As shown in that patent application, the magnesium forms complex coordination compounds that can contain multiple subunits, which may differ, and each of which may contain magnesium alone or magnesium complexed with water molecules and or the s-omeprazole. The '486 patent fails to recognize that such coordination complexes may occur, how to make such complexes, or how to identify which complexes are needed in order to achieve the desired "stability" that is discussed in the '486 patent.

41. The '486 patent fails to recognize that how and where the magnesium is associated with the quinapril may have a profound effect on the properties of any "magnesium quinapril" structure. Of particular concern is the failure to recognize in the patent that the quinapril degradation products that are discussed in the '486 patent, namely hydrolysis and cyclization, arise from degradation pathways that result from modifications that occur at different parts of the molecule. This is exemplified in Stanisz, *Acta Poloniae Pharmaceutica – Drug Research,* Vol. 62, No. 3, pp. 189-193, (2005) ("Exhibit G"), which illustrates the two different regions of the quinapril molecule that are involved with each such degradation pathway. Clearly, if one is to protect against degradation resulting from both pathways, then there is a need to protect both portions of the quinapril molecule that are involved in both pathways. Nothing in the '486 patent illustrates how or what that structure should be or how to achieve such a structure.

42. Given the dearth of information in the patent, the file history and the prior art concerning the identity of "quinapril magnesium," a POSA faced with the disclosure of the '486 patent would not have understood the meaning of the claim term "quinapril magnesium." Accordingly, in my opinion the claim term "quinapril magnesium" is of indeterminate scope and cannot be given any reasonable construction.

14

I declare under the penalty of perjury that the statements set forth herein are true and correct to the best of my knowledge and are based on my personal knowledge or experience.

Dated: December 13th 2012

_____

Michael Zaworotko, Ph.D.

15